Good morning, Your Honors. May it please the Court. Fong Tran on behalf of the appellant Thomas Cunningham. The issue of this appeal is to determine whether the appellant has sufficiently pled a claim for securities fraud. This is a case about a corrupt CEO, Jason Hart, who continuously misappropriated corporate funds by making improper claims for reimbursement of personal expenses. In so doing, defendants falsely reported Hart's executive compensation for fiscal years 2013 and 2014 to conceal his corporate abuse. Now, the district court's dismissal of the complaint should be reversed, particularly with respect to its ruling on scienter and loss causation. As to scienter, the court below failed to properly credit the allegations of the complaint and did not conduct a true holistic analysis. Applying the correct analysis under TELL Labs, we have sufficiently pled a strong inference that defendants acted deliberately reckless in misrepresenting Hart's compensation. And I'd like to speak for a moment on the deliberate recklessness standard that the – because there was some misunderstanding about that standard by the district court and how to apply it. As this Court has held in the Aruna Pharmaceutical case as well as Verifone Holdings, deliberate recklessness means a standard extreme departure from the ordinary standards such that it would present an obvious danger of misleading investors. And that is what we have here, and that is what we have pled. But instead of applying that standard, the district court applied a much more stringent standard. It relied on an older Supreme Court case, the case of Ernst v. Hockfilter. And applying that case, the lower court said, quote, a plaintiff must plea, quote, an intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities. And that's on page 20 of the dismissal order. That is not the standard we have pled here, and that's not the standard that we need to demonstrate. We don't have to allege a specific intent to defraud investors, nor do we have to show an intent or effect to control or artificially affect the price of securities. As this Court has held in the Desai v. Deutsche Bank case, that standard articulated in Ernst v. Ernst, the manipulative the intentional willful conduct standard, that only applies to manipulative conduct cases under Rule 10b-5. This is not a manipulative conduct case. This is a case involving false and misleading statements concerning Hart's compensation. So on that basis alone, the Court erred. Now, I'd like to go to discuss the holistic analysis relating to Scienter. And when we discuss that, particularly applying the deliberate recklessness standard that I just articulated, I think it's important to consider what the company was going through at the time. It's not an exaggeration to say that the company was in dire straits. It was in terrible financial condition. Identiv was suffering severe operating losses and bleeding cash at an alarming rate, such that it faced delisting from the NASDAQ market. Obviously, that would have been a catastrophe for its business. So in this context, against that backdrop, we have the individual defendants, the CEO, Jason Hart, and the CFO, Brian Nelson. They are making specific assurances to the market, assuring the market that they are specifically focused on monitoring and cutting costs. Specifically, they're laser-focused on operating expenses, or what the company refers to as OPEX, OPEX. Why is that important? Well, operating expenses specifically by definition includes executive compensation, payroll expenses, reimbursement charges. So the individual defendants had their eyes specifically on that stuff. And they're telling the market, they're making pointed representations to the market that they're focused significantly on cost reductions. We have our eyes on OPEX. We will not let up on OPEX. So based on those allegations, Your Honor, it's clear that the individual defendants had direct access, knowledge, and insight to sort of the underlying company fraud, particularly the reimbursement issues and the ultimate false reporting of Hart's executive compensation. And to be clear, we are not just alleging direct access here. We are alleging the individual defendants' direct involvement in the underlying fraud. Hart was the source of the corporate fraud, and Nelson was his willing accomplice. He was a willing participant in the fraud. We have alleged direct witness sources which point to Mr. Hart flagrantly disregarding corporate funds for his own personal benefits. He buys a flying drone worth $5,000 for his own benefit. He takes two trips to Las Vegas on July 4th, 2011, and September 11th, 2011. Can I interrupt you for just a second? Sure. That all sounds, you know, improper to me, okay? I certainly would not want to own company where a director or the executive was spending money like that. But that's not really the issue, is it? The issue is whether or not whatever it was he was doing, he was doing it because he was intending to defraud the investors. Is there any evidence of that? Yes, Your Honor, and I appreciate Your Honor's questions. And there was a direct relationship or direct connection between Hart's practice of seeking reimbursement for personal expenses and the false reporting of his executive compensation. As a public company, Identiv is required by the SEC to fully and accurately report executive compensation, Hart's executive compensation. That includes any financial benefit he receives from the company, including those improper reimbursements. But rather than report that, defendants did not do that and thus concealed his improper reimbursement practices. And the company actually confirms that there is that interconnectivity between his improper reimbursement practices and the false reporting in the May 4th — the May 1st disclosure is the first time the company discloses the existence of the Ruggiero complaint, the existence of a civil complaint relating to Hart's improper reimbursement practices. And in that — in that statement — and I'm sorry. I'm sorry. The company actually confirms the link between Hart's improper reimbursement practices and the false reporting in the November 30th disclosure. And I'm sorry. I'm trying — I lost my track. It's okay. Just relax. Just relax. It's okay. You want to — we're trying to get to the bottom to it. I think you're alluding to this is you're trying to point us to allegations where the company is actually cooking the books or misleading the investors. Is that what you're saying? Yes. And I'm sorry. It's actually the May 1st disclosure. All right. The company announces that it's going to file an amendment to its 2014 10-K. This is the same 2014 10-K that falsely reports Hart's executive compensation. And the reason why it's filing that amendment is because of this complaint regarding Hart's executive compensation — I'm sorry, his improper reimbursement practices. So that is the link. The company says we have to amend our 10-K reporting Hart's executive compensation due to the fact that there's this civil complaint out there regarding his improper reimbursement practices and the fact that there's a special committee investigation into those practices. So that's the link between the conduct, Your Honor. Well, in terms of this loss issue, what the district court said was something to the effect that the court had basically searched all of the allegations front to back and can't find an allegation of accounting fraud or manipulation in the financial statements. What's wrong with that statement with respect to loss causation? Yes, Your Honor, and I think the lower court made a glaring error in that conclusion to the extent that it overlooked prominent allegations in the complaint, which demonstrated that Hart and Nelson both had direct control and responsibility over the financial statements which reported Hart's executive compensation. So as I mentioned, the company has an obligation to report his executive compensation. They could have done so in the 10-Ks. But rather than report his executive compensation in the 10-Ks, they direct investors' attention to the proxy statements. And the 2013 and 2014 10-Ks specifically incorporate by reference those proxy statements. And so Hart, as the CEO of the company ---- I'm just trying to get ---- we have a couple of bad apples here. And is your point that you can't, once you figure out that you've made a mistake or were unable to sneak by a mistake, you can't amend it and then disclose it to investors? I'm trying to understand exactly where the fraud is here, as alleged. I'm sorry, Your Honor. I think it was more than a mistake. We've demonstrated deliberate recklessness on the part of Hart and Nelson. And I think if you take a look at the scienter allegations holistically from their direct involvement in the fraud and the ---- This seems a little bit different than the case you cite to Verifone, where they were basically making multimillion-dollar adjustments in the accounting and they're directly supervising and directing these adjustments. This seems like quite a different case, isn't it? What is the allegation? What's your best allegation I should look at in terms of their direct participation in all this? The fact that they had direct responsibility over the financial statements. Hart was a principal signatory as the CEO of the company. He signed off on the 10-Ks and the proxy statements. But that would make every company present guilty of securities fraud anytime there had been some problem with the financial statements, and that can't be the case, right? I mean, because everybody ultimately has to ---- everybody, meaning the CEO or whomever, ultimately signs the 10-K. If we were only to allege that the signing and the certifications of the financial statements was the only basis for scienter, but we're not. We're talking about an ongoing course of conduct by Hart and Nelson. They signed the financial statements. And the company ultimately admits it at the end that Hart's compensation was falsely reported. But simply because they admit that it was falsely reported doesn't mean that they intended to defraud investors at the time they made the disclosures, does it? Yes, Your Honor. And I think, again, I think the standard is deliberate recklessness. Did they show a callous disregard for the falsity of those statements? And I think we've shown that through the analysis. You might want to reserve some time, though. Yes, Your Honor. You're down to about a minute and a half. I'd like to. Okay, I'll reserve some time. Thank you. Thank you. May it please the Court. Chris McGrath and Paul Hastings for Defendant Annapoli Idenovink. I'm also going to attempt to manage my time to preserve some for my colleagues here. Could you give us a clue about your plan? My plan is to use approximately eight minutes, Your Honor, for myself. All right, so maybe it would be easiest if you would just put eight minutes on the clock. Thank you. Thank you, Your Honor. May I begin? Please. Your Honor, it's clear from the underlying order, and I know this is de novo review, but Judge Breyer conducted a thoughtful and thorough review of plaintiff's allegations, including a holistic analysis. Plaintiff's counsel has indicated he did not properly apply the TELAB standard or understand that deliberate recklessness is one of the components of a Sienner evaluation. If you look at the order where he defines Sienner, he plainly has TELAB cited. He plainly talks about deliberate recklessness, as well as the other language that the Ninth Circuit has advised to be used. So Judge Breyer was well aware of the standard and did apply an analysis both individually to the allegations and an overall holistic picture. But what he ultimately concluded was, although the SAC, the Second Amendment complaint, alleges corporate wrongdoing, it does not allege a securities claim. And that goes to your point, Judge Benitez. And in doing so, he was following the U.S. Supreme Court's holding in Santa Fe v. Green, which held that the securities laws do not create a Federal remedy for corporate misconduct, and a plaintiff may not bootstrap a claim for internal corporate mismanagement or breach of fiduciary duty by alleging a failure to disclose that mismanagement or breach. And that's, in fact, what this case is all about. We're talking about expense reimbursements for the CEO and whether proper procedures were followed or they were properly documented. And as your question earlier raised, Your Honor, who is that conduct, even if you assume it's all true, as we would in a motion to dismiss, who is that conduct directed toward? Is it directed toward investors or is it directed toward getting reimbursed? And that is where I think counsel's argument got derailed earlier, is there was no failure by Judge Breyer to understand the deliberate recklessness standard, but what he was looking at was who's the conduct directed toward. And what he concluded correctly was the scioner that the SAC is required to allege is an intent to defraud investors, not an intent to get reimbursed. And even if you gave credit to these allegations from the Ruggiero complaint, which are uncorroborated, plaintiff doesn't — plaintiff's counsel doesn't represent Ms. Ruggiero, but nonetheless piggybacked those allegations into this complaint, and the confidential witness that was only there for eight months of the class period and was in the HR group, what you come away with is the understanding that they paint a picture of a CEO impatient to be reimbursed for personal expenses without following the necessary processes and a CFO more interested in granting reimbursements than in following the necessary processes. I'm not saying that's what occurred. I'm saying that's what, on the best case, the plaintiff or the complaint alleges. And that is the fundamental problem with this lawsuit, is it was dismissed by Judge Breyer on two independently sufficient grounds, absence of scioner and failure to demonstrate loss causation. And the real failure in the scioner region is they haven't shown any conduct directed towards investors. Plaintiff's counsel, when arguing, argued more generically that Hart and Nelson were involved or responsible for the company's overall financial statements, and therefore improper reimbursements would constitute an effort to defraud investors through that extrapolation. And what the Court recognized in carefully parsing the complaint was that there are no allegations, as Judge McCown pointed out, of any accounting fraud or manipulation of Identiv's financial statements. In fact, those compensation lines, the other compensation lines in the proxy statement, are not technically part of the financial statements. You want to get them right, of course, but they're not technically part of the financial statements. And there's never been a restatement of any of Identiv's financial statements. In addition, there's no allegations that Hart and the complainant, Ms. Ruggiero, conceded did not prepare his own expenses, much less prepare the other compensation lines of the relevant proxy statements. Therefore, that nexus between his conduct and understanding that it would necessarily also be directed at investors is not there. That link is not there. Those allegations are not there. And that's why the complaint was dismissed on to all the other holistic factors that Judge Breyer thoroughly evaluated, which included the absence of any stock sales by any of the individual defendants, the relatively minimal amounts in the grand scheme of Hart's compensation that these ultimate adjustments constituted, which were $97,000 for the year 2014 and $13,000 for the year 2015. So those amounts were not real money to most of us, but they were not material to him. And it's understandable why Judge Breyer would conclude those are minor variances in the other compensation lines. And it's understandable Hart would not believe that those would mislead investors. So in addition to the cyanide deficiencies, there was a whole other line of analysis that the Court undertook, which I plaintiff made brief reference to, on the lost causation front, and that is that the series of disclosures that they point to don't satisfy the requirements of the Luce case, the Lloyd case, or Ninth Circuit precedent requiring that the disclosures that there be a corrective disclosure illustrating the truth behind the supposed misrepresentation. So I think his point on that is you don't have any relationship between any stock loss and any events. And the one point they brought up was, well, what happens when there is the correction, kind of the backward correction, and what's the stock situation, what's the price situation then? Well, when, I'm not sure exactly what he's referring to. He's talking about when the Ruggiero complaint comes out, and then it's acknowledged that there was some misstatement with respect to the compensation. So then, again, there's a restatement at that point. Yeah. There was never a restatement, Your Honor. There was only an adjustment to the compensation figure. Adjustment to the compensation. In the amended 10-K later. Okay. So they then, but there is, the amended 10-K discloses the adjusted compensation, correct? Right. And if I can go quickly through, because I've got about a minute left on the time I've assigned to myself, that May 1st announcement he referred to merely announced the receipt of the Ruggiero complaint, the formation of a special committee to investigate its allegations, and that SEC filings to be delayed. Under Lloyd and Luce, the mere announcement of an investigation, and in the Luce case, that was a government authorization. There has to be a corrective disclosure later that reveals the supposed truth. And all we have in the intervening announcements that they reference in the complaint are just further delay, no new information. Subsequently they had already basically given up the ship, acknowledging that they had some financial difficulties and problems in their financial controls, right? There's certainly been internal control disclosures previously, although I would note for the record that Plaintiff abandoned the internal controls misstatement allegations for the purposes of this appeal. But I would also note that unlike Luce and Lloyd, which had dramatic stock drops when the investigations were announced of, I believe, 12 and or 23 percent and 20 percent, 23 in Luce, 20 in Lloyd, there was a 1.4 percent drop when Identiv announced the receipt of the Ruggiero complaint in the commencement of investigations. So the market did not perceive it that way. There's no allegations that analysts in the market perceived it that way, which is clear in Luce and Lloyd. And ultimately when the 10-K-A was announced with the adjustment of the compensation line, the stock price of Identiv actually increased, didn't decrease. And so on the basis of all of those statements, including the ones reflecting BDO, the auditing firm's resignation, but Judge Breyer correctly determined that their resignation was not linked to any wrongdoing associated with Hart's expense reimbursements. It was linked to an internal weakness stated in 2015 that had nothing to do with the allegations of the complaint and its unhappiness with the special committee process. Thank you. With that, I'll turn it over. Thank you, Your Honor. So are we having two more counsel? Yes, Your Honor. I'm counsel for Jason Hart. And you're going to spend three minutes? Yes. So why don't we put seven minutes on the clock and you can share that with Mr. Nelson. Good morning. May it please the Court. Alex Talerides on behalf of Appley, Jason Hart. Your Honors, we obviously concur wholeheartedly with Mr. McGrath's points. And so I'll just very briefly emphasize points that pertain to Mr. Hart. Counsel for the plaintiff noted or complains that the district court did not examine the Sientra allegations holistically under Tellabs. And that argument presupposes that this case is your standard 10b, Section 10b, 10b5 case, where you have a misstatement made by someone and an intention to disqualify and defraud someone. In this case, you don't have that. You don't have to get to a holistic analysis under Tellabs because it's this case is essentially a mismanagement case trying to be converted into a securities case. It's the plaintiffs have attempted to fit a square peg in a ground hole. What we have here are two very obscure line items in a other compensation table that are not part of financial statements, that one in a proxy statement in 2013 and another in a preliminary proxy statement in 2014 that is not incorporated into 10k. There's no allegation that Mr. Hart had any involvement in preparation of these tables, much less that he had any awareness or understanding between the relationship between his submission of expense reports and any impact that that would have on this other compensation table that he's not alleged to have prepared, much less that that would have any impact on what investors would do in the connection with the purchase or sale of security, which is what section 10b is grounded on. The Court asked the Plaintiffs' Counsel a moment ago, what is the best allegation? And the response was, is that Mr. Hart and Mr. Nelson were directly involved in the financial reporting, so they must have been aware of the misleading nature of financial reporting. Well, as the district court noted below, that argument rings hollow because there was no revision to the financial statements, no much less every statement. So the notion that Mr. Hart would have been aware of the impact of the financial statements or financial reporting of the company based on its expensory reimbursements is just untenable here. We've seen a lot in the briefs, appellant's briefs, a lot of labels about accounting fraud, accounting manipulation, manipulation of financial statements. That's not tethered to anything in the complaint, much less reality. I mean, there's no accounting issue here. There's no mistake or financial restatement or revision of any impact on the company's bottom line. And so even if you credit the Ruggiero complaints' unverified and contested allegations, which is what the complainants in this case have cribbed from, I mean, it's basically based entirely on this Ruggiero complaint. And if you credit them and shouldn't, just even based on the PSLRA pleading requirements, the type of scienter that is at best formed under those unverified and contested allegations is a scienter going to wanting to get reimbursed for personal expenses. It has nothing to do with what the cause of action here is, a Federal securities fraud claim. Thank you. Oh, did you have a question, Your Honor? I'm sorry. Thank you. If you appropriately have time for Ms. Brody. Thank you. May it please the Court, Sarah Brody on behalf of Defendant Brian Nelson. Mr. Nelson was the CFO of the --- excuse me, of Identif in the time period in question. I will try not to repeat arguments you've already heard, but focus specifically on Mr. Nelson. The statements at issue in this case that are alleged to be false and misleading are statements with respect to Mr. Hart's compensation that were disclosed to the to the --- disclosed in the proxy statements. There are no allegations that Mr. Nelson participated in the proxy statements or signed the proxy statements, or those are statements that he made. Instead, the allegations with respect to Mr. Nelson are that in the company's 10-Ks for 2013 and 2014, both of which were issued in advance of the proxy statement, Mr. Nelson is a signatory, and he and the 10-Ks state that for executive compensation, see the proxy statements, which will be filed subsequently. The plaintiffs don't tie those two statements up with respect to Mr. Nelson. There are no allegations to suggest that at the time that Mr. Nelson signed the two 10-Ks, he had knowledge or awareness of what was going to be released in the proxy statements, or that he had any knowledge or awareness that those -- anything in those proxy statements would be misleading or there would be any omissions in them. So there's no connection there. And that goes to a point which, as this Court is reviewing the underlying case de novo, goes actually to whether there's even a material misstatement on behalf of Mr. Nelson, a specific issue as to him. With respect to his scienter, on that fact, the Plaintiffs' Counsel, on behalf of Mr. Cunningham, pointed, he said his best fact was the direct participation that the defendants, including Mr. Nelson, had with respect to the expenses. What you have in the record in the complaint alleged by Mr. Cunningham with respect to Mr. Nelson's participation in expenses is our allegations that when expense reported, that's the allegations made by Ms. Ruggiero, and that he returned certain expense reports. That those are the allegations with respect to Mr. Nelson. That doesn't get to scienter. The statements about financial statements being misstated are not applicable to this case because this isn't a financial statement case. This is a case about whether executive compensation in amounts of, in total, around $100,000 over the course of two years were properly disclosed in a proxy statement. So the issues here just simply do not match up. When you go through the scienter elements, what you see instead are two executives very busy with a lot of aspects of a company that is struggling. That doesn't tell you that they're in the weeds with respect to expense reports. You see that they are trying very hard to get, to get the information on the expense reports. And then you can go through all the other elements, none of which show specific scienter here, all of which, if you listen, take the allegations by Mr. Cunningham, really prove too much because they would mean in every case there would be scienter with respect to the CFO. And finally, there were no stock sales or anything else. Zucco covers that point. Exactly. Zucco covers all of that. And so there's nothing to show anything unusual or specific that would give you, give rise to scienter here. Thank you, Your Honors. Thank you. We have some rebuttal time. Thank you, Your Honor. And I'd like to address the issue of loss causation. And I think the appropriate starting point for the loss causation analysis is this Court's decision in the First Solar case, which was decided after the close of the appellate briefing. So the district court didn't really have the advantage of getting guidance from that. So First Solar really took a back-to-basics approach and just confirmed the basic loss causation principles articulated by the Supreme Court in Dura and this Court in Dow. And all that First Solar says is to allege loss causation, you just need to demonstrate a causal connection between the alleged fraud and the loss. And that is what we have alleged here. And the allegations need only be plausible. So our allegations of loss causation fall squarely within First Solar as well as the paradigm established in Lloyd. And as Lloyd holds that you can prove loss causation by showing, by alleging an announcement of investigation, a negative stock price reaction, and then a corrective disclosure. And we have shown that. We have shown loss causation through three investigation announcements in May. And we have a subsequent partial disclosure in November, November 14, 2014, which is the announcement of BDO's resignation, the independent auditor. And then we have that final bookend corrective disclosure in December 18, when the company admits that it has improperly reported Hart's executive compensation due to his receipts of reimbursement for personal expenses. So that's the corrective disclosure. And it relates back to the May announcements as well as the November 30th disclosure announcing BDO's resignation. And I think that suffices to raise, to allege loss causation under First Solar as well as Lloyd. Thank you. Thank you, Your Honor. Thank you for your argument of counsel this morning. Cunningham versus Identitive is submitted and we're adjourned for the morning.
judges: Fernandez, McKeown, Benitez